**NOT FOR PUBLICATION**                                           **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLES ALDRIDGE, | : |
| | : Hon. Faith S. Hochberg |
| Plaintiff, | : |
| v. | : Civil No. 11-1798 (FSH) |
| | : |
| MICHAEL J. ASTRUE, | : **OPINION & ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | : |
| | : Date: December 20, 2011 |
| Defendant. | : |

**HOCHBERG, District Judge:**

This matter comes before the Court upon Plaintiff Charles Aldridge's ("Plaintiff") motion to review a final determination of the Commissioner of the Social Security Administration ("Commissioner") pursuant to the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g). The motion has been decided upon the written submissions of the parties pursuant to Fed. R. Civ. P. 78.

## BACKGROUND

### I. Factual Background

Plaintiff, born in 1964, is a high school graduate and has earned an Associate's degree. Tr. 31. His only relevant past work experience was as an HVAC technician. Tr. 30-32. In performing his duties as an HVAC technician, Plaintiff would typically be on his feet all day and lift and carry items weighing between 15 and 60 pounds. Tr. 32-33. Plaintiff alleges that he is disabled because he suffers from congestive heart failure, cardiovascular disease, and obesity, and that as a result, he has been unable to engage in any gainful employment from the period of

1

on or about January 1, 2007 up to the present.  Compl. ¶¶ 4-5.

Plaintiff stopped working in January 2007 after missing work excessively due to fatigue and shortness of breath that interfered with his ability to travel to and from his place of employment.  Tr. 33.  Plaintiff was "either too tired or just couldn't make it in," had transportation issues, and was "totally exhausted" most of the time.  Tr. 34.  Plaintiff can stand for up to two hours and walk for certain periods of time, and he can walk about five blocks without feeling uncomfortable.  Tr. 35, 42.  Additionally, Plaintiff has no issues with sitting.  Tr. 35.  However, he believes that he would be unable to perform a job requiring him to sit because he would more than likely fall asleep.  Tr. 36.  Additionally, he has swelling in his legs that causes him pain.  Tr. 38.  Currently, Plaintiff weighs approximately 270 pounds.  Tr. 41-42.

Plaintiff has used illegal narcotics, including cocaine, on and off over periods of time and most recently in November 2008.  Tr. 38.  Additionally, Plaintiff has not been compliant with the exercise regimens prescribed by his doctors due to poor stamina.  Tr. 39.

Plaintiff was first examined at the Veterans Affairs Medical Center ("VMAC") on May 23, 2006, when he was diagnosed with a history of congestive heart failure and hypertension.  Tr. 268.  He was admitted to VMAC on February 15, 2007 as a result of shortness of breath and swelling of the legs, and a chest x-ray showed cardiomegaly.[1]  Tr. 169.  He was subsequently diagnosed with congestive heart failure exacerbation and hypertension and discharged after staying overnight.  Tr. 171-72, 166.

James Maher, M.D. examined Plaintiff on February 20, 2007 and diagnosed him with non-ischemic cardiomyopathy.  Tr. 190-92.  Dr. Maher found that Plaintiff was suffering from

---

[1] Enlargement of the heart.  Taber's Cyclopedic Medical Dictionary ("Taber's") 900 (19th ed., 2001).

trace bilateral edema,[2] as well as an ejection fraction of less than 10%.[3]  Tr. 191.  Additionally,

Plaintiff complained of shortness of breath and of having to sleep sitting up as a result of this

condition.  *Id.*  Dr. Maher later deemed Plaintiff to be "totally disabled" due to his medical

condition.  Tr. 278.  The results of a subsequent stress test showed evidence of a "moderate fixed

defect along the anteroseptal wall, an additional moderate perfusion defect within the inferior

wall, a small defect in the apical lateral wall, significant enlargement of the left ventricle, and

ejection fraction of 28%."  Tr. 289.

On June 30, 2008, Plaintiff was seen by Kulandaivelu Chandrasekaran, M.D., in the

emergency room at VMAC after complaining of left rib pain and shortness of breath.  Tr. 620,

525.  He was diagnosed with costochondritis,[4] and further x-rays once again revealed

cardiomegaly.  Tr. 547, 489.  On January 27, 2009, Plaintiff was diagnosed with hypertension

after complaining of high blood pressure.  Tr. 505-08.  On April 13, 2009, an x-ray showed

cardiomegaly with mild to moderate pulmonary vascular congestion.  Tr. 488.  An

echocardiogram on April 20, 2009 revealed "severe global LV hypokinesis[5] with spectral

remodeling, left ventricular ejection fraction of 10%, mild left atrial enlargement, and grade II

diastolic dysfunction."  Tr. 498.

Dr. Chandrasekaran diagnosed Plaintiff once again with congestive heart failure after

finding shortness of breath, fatigue, weakness, edema, palpitations, and syncope.  Tr. 481.  These

symptoms were found to be compounded by emotional stress, cold weather, physical exertion,

---

[2] A local or generalized swelling in which the body tissues contain an excessive amount of fluid. Taber's 638.

[3] The percentage of the blood emptied from the ventricle during systole; the left ventricular ejection fraction averages 60% to 70% in healthy hearts. Taber's, 644.

[4] Inflammation of the costochondral joints of the chest, which can cause chest pain.  Taber's 475.

[5] Decreased movement.  Taber's 1002.

and by being placed in a work environment.  Tr. 482-83.  Dr. Chandrasekaran noted that Plaintiff

was able to sit for four hours total and stand or walk less than one hour during a typical eight-

hour workday, and he estimated that Plaintiff would be absent from work more than three times

per month as a result.  Tr. 483-84.

At the hearing before the Administrative Law Judge ("ALJ"), Martin Fechner, M.D.,

testified that Plaintiff could perform a full range of sedentary work, as his ejection fraction had

risen to between 30 and 35%.  Tr. 42-44.  With regard to Plaintiff's ejection fraction levels, as

previously noted, a number of different percentages were recorded since the start of his

treatment.  In February 2007, Dr. Maher noted an ejection fraction of as low as 10%, and Dr.

Fechner concurred that at that time the level was somewhere between 5 and 10 %.  Tr. 20, 191.

Dr. Fechner testified at the hearing before the ALJ that this instance was likely an acute attack

exacerbated by drug use, including cocaine and marijuana.  Tr. 18, 20.  In June 2007, Plaintiff's

ejection fraction level was up to 28% according to Dr. Maher and between 30-36% according to

Dr. Fechner.  Tr. 20, 289.  Plaintiff's ejection fraction level was back at 10% during a visit to Dr.

Chandrasekaran in April 2009.  Tr. 498.  This evidence, however, was not made available to Dr.

Fechner at the time of the hearing before the ALJ.  Tr. 19.  Dr. Fechner questioned how Dr.

Chandrasekaran came up with the notion that Plaintiff would miss at least three days of work per

month due to his condition; he did so, however, without having access to any medical evidence

or records for the Plaintiff after June 11, 2007.  Tr. 49, 40.

### II. Procedural History

On June 26, 2007, Plaintiff filed an application for Social Security Disability Insurance

Benefits, alleging disability since January 1, 2007.  Tr. 100-101.  Plaintiff's claim was denied

4

both initially, Tr. 58-62, and upon reconsideration.  Tr. 64-66.   Subsequently, on May 8, 2008,

Plaintiff requested a hearing before an ALJ.  Tr. 67-68.  A hearing was held on August 31, 2009

before ALJ Richard West.  Tr. 24-51.  Plaintiff testified at the hearing, and he was represented by

counsel.  *Id.*  ALJ West issued a decision on September 15, 2009, finding that Plaintiff was not

disabled and therefore not entitled to the benefits requested.  On October 5, 2009, Plaintiff

requested review of the ALJ's decision.  Tr. 11.  The request was subsequently denied by the

Appeals Council on February 15, 2011, and the decision of ALJ West became the final decision

of the Commissioner.  Tr. 1-5.  Plaintiff then commenced this action by filing a complaint on

March 30, 2011.

## LEGAL STANDARDS

### I. Standard of Review

The Court may review a decision of the Commissioner of Social Security under 42 U.S.C.

§ 405(g).  Review of the Commissioner's final decision is limited to determining whether the

findings and the decision are supported by substantial evidence.  42 U.S.C. § 405(g).  In order to

uphold the decision, there must be "more than a mere scintilla" of evidence, and the evidence

presented must be the sort that "a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Although the Court is not

empowered to conduct a *de novo* review of the decision of the Commissioner, it must consider

the totality of the evidence in deciding whether or not to uphold the Commissioner's

determination.  However, "the substantial evidence standard is a deferential standard of review,"

and the decision of the ALJ will not be set aside regardless of whether the Court "would have

decided the factual inquiry differently.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  If

substantial evidence exists to support the Commissioner's conclusion, the decision will not be disturbed.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.1999).

In determining whether there is substantial evidence in the record on which the ALJ relied in making his decision, the Court utilizes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history, and present age." *Santini v. Comm'r of Soc. Sec*, No. 08-5348, 2009 WL 3380319, at *2 (D.N.J. Oct. 15, 2009).

## II. Standard for Finding of Disability

According to the Social Security Act, "disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant is only designated as disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. 423(d)(2)(A).  Additionally, the claimant's impairment must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner has promulgated a five-step sequential analysis that is employed to

determine whether or not a person is disabled and thus entitled to disability benefits, summarized as follows:

1) Is the claimant currently engaged in substantial gainful activity?
2) Does the claimant have a "severe" impairment or combination of impairments which significantly limits his physical or mental ability to do work?
3) Does the claimant have an impairment(s) which is listed in Appendix 1 of the regulations, or is equal to a listed impairment? If he does not suffer from a listed impairment, the Commissioner will assess his residual functional capacity ("RFC").
4) Does the claimant have the RFC to perform past relevant work, despite his severe impairment?
5) If unable to perform any past relevant work, can the claimant do any other work in the national economy, considering his RFC, age, education, and past work experience?

20 C.F.R. § 404.1520(a)-(g); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). The burden of proof falls on the claimant for all steps of the analysis except the fifth step, on which the Commissioner bears the burden of proof.

Applying the aforementioned analytical framework, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since his alleged onset date. Tr. 17. The ALJ also found that Plaintiff suffered from several severe impairments, including congestive heart failure, hypertensive cardiovascular disease, and obesity. *Id.* Next, the ALJ, while specifically considering listing 4.02 in the Appendix of the Regulations, found that Plaintiff did not suffer from an impairment that met or equaled the Listings in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Tr. 18. Subsequently, the ALJ determined that Plaintiff had the RFC to perform a full range of sedentary work, which involves lifting ten pounds or less, the occasional lifting or carrying of small items, and occasional walking and standing. Tr. 18; 20 C.F.R. § 401.1567(a). At step four, the ALJ determined that Plaintiff could not perform any of his past relevant work, which only included that of an HVAC technician. Tr. 21. Finally, at step five, the ALJ concluded that a finding of "not disabled" was merited by Medical-Vocational Rule 201.21 of 10 C.F.R. § 404,

7

Subpt. P, App. 2.  The ALJ made this final determination after considering Plaintiff's RFC, age,

education, and work experience together with the Medical-Vocational Guidelines. 20 C.F.R. Pt.

404, Subpt. P, App.2.

## DISCUSSION

I.     **Review of the Commissioner's Decision**

To determine whether an individual can receive disability benefits, an ALJ "must

consider all the evidence and give some reason for discounting the evidence [the ALJ] rejects."

*Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).  The ALJ is not required to undertake a

comprehensive analysis of why he or she is rejecting evidence with some probative value; rather,

a short sentence explaining his or her rationale is sufficient.  *Cotter v. Harris*, 642 F.2d 700, 705

(3d Cir. 1981).  However, while the ALJ may choose which evidence to credit when a conflict

exists, he or she may not "reject evidence for no reason or for the wrong reason."  *Plummer*, 186

F.3d at 429.  Thus, the ALJ's findings must allow for meaningful review by the Court by being

developed into a sufficient record. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).

Plaintiff contends that the ALJ's decision is not supported by substantial evidence and

should be reversed and remanded either for an awarding of benefits or for a new hearing and

decision.  Pl. Br. 19.  Plaintiff challenges the decision of the Commissioner on three grounds: (1)

that the ALJ failed to follow the Treating Physician Rule; (2) that the ALJ failed to properly

evaluate Plaintiff's obesity; and (3) that the ALJ failed to properly evaluate Plaintiff's credibility.

Pl. Br. 9-18.  The Commissioner argues that the ALJ's decision is well-supported by substantial

evidence with regard to all three points raised by Plaintiff.  Def. Br. 10.  Because the Court

cannot determine from the record whether the ALJ properly evaluated the medical evidence

before him, the Court need only address Plaintiff's first argument.

II.     **Treating Physician Rule**

Plaintiff argues that the ALJ failed to properly determine his RFC by failing to follow the treating physician rule in rejecting the opinion of Dr. Chandrasekaran and treating the opinion of Dr. Fechner as substantial evidence.  Pl. Br. at 9-10.  Plaintiff further argues that, even if the ALJ did not err in according less than controlling weight to Dr. Chandrasekaran's opinion, he still failed to weigh it under the factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6).  *Id*. at 13. Because the Court is unable to determine whether the ALJ considered all of Plaintiff's ejection fraction measurement levels within the evidence, this case will be remanded  in order to allow the ALJ to more fully explain and consider all of the available medical evidence relating to Plaintiff's ejection fraction levels .

A treating physician's opinion is "entitled to substantial and at times even controlling weight."  *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).  It is only considered controlling, however, when it is "not inconsistent with any other substantial evidence" presented within the record and is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  *Id.*  Nothing prevents an ALJ from crediting a non-treating source over a treating source.  If the ALJ does not give the opinion controlling weight, he or she then uses six factors in weighing the treating physician's non-controlling opinion, including (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors.  *See Irelan v. Barnhart*, 82 Fed. Appx. 66, 71 (3d Cir. 2003); 20 C.F.R. §§ 404.1527(d), 416.927(d).  Additionally, the ALJ must not make the determination "due to his or her own credibility judgments, speculation or lay opinion."  *Morales v. Apfel*, 225 F.3d 310, 317

9

(3d Cir. 2000).

An ALJ determines a claimant's RFC based on the medical records, observations made during formal medical examinations, descriptions of claimant's limitations, and observations of the claimant's limitations by others, as well as medical testimony not based on formal medical evaluations. *Buckley v. Astrue*, No. 09-CV-5058, 2010 WL 3035746, at *9 (D.N.J. Aug. 3, 2010); 20 C.F.R. § 404.1545(a).  Furthermore, if the evidence presented is contradictory, "the ALJ is not only entitled to make a choice between options . . . *he is required to do so.*" *Id.* (quoting *Cotter*, 642 F.2d at 705) (emphasis in original). The ALJ is ultimately the trier of fact, and thus has the discretion to weigh the evidence and resolve any material conflicts that arise.  20 C.F.R. § 404.1527(c).

Here, the ALJ's decision about the weight to be given to the respective physicians' opinions should be revisited due to the ALJ's reliance on the opinion of the Medical Expert, who did not take into account medical evidence after 2007.  The court notes that Plaintiff's treating physician relied on 2009 testing in making his determinations regarding Plaintiff's RFC.   In addition, it is unclear whether the ALJ considered all of the ejection fraction level measurements within the record, including the most recent measurement from 2009, in reaching his ultimate decision.[6]  The Court cannot determine whether the ALJ fully considered the medical evidence

---

[6] In his decision, the ALJ stated that Plaintiff's ejection fraction level in May 2009 did not meet the listings level despite a slight decrease.  Tr. 21. The Court cannot find evidence of a measurement of an ejection fraction level from May 2009, and the page in the record cited by the ALJ references an echocardiogram done on "6/12/09."  Tr. 498.  The Court believes that this date may be a typographical error, as Plaintiff also had an echocardiogram on June 12, 2007 and there is no other evidence of such a test in 2009 other than on April 20, 2009.  Tr. 381, 493-94 ("Last echo was in 2007.").  Because the ejection fraction measurements have varied substantially over time, it shall by up to the ALJ on remand whether there is a basis to re-open record to obtain updated measurements of this crucial indicator of cardiac function.

before him, and therefore this case will be remanded in order to give the ALJ an opportunity to more fully explain his reasoning particularly with respect to the varying and disparate ejection fraction measurements.

The ALJ specifically stated that he found the opinion of Dr. Martin Fechner, the Commissioner's Medical Expert, more consistent with the record evidence than Dr. Chandrasekaran's opinion.  Tr. 20. The Medical Expert believed, contrary to Dr. Chandrasekaran's assertions, that Plaintiff would be capable of doing a full range of sedentary work.  Tr. 44-5.  In order to meet the requirements of the Social Security Administration's listing for congestive heart failure, Plaintiff had to show that he had an ejection fraction less than or equal to 30 percent "during a period of stability (not during an episode of acute heart failure)." 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Plaintiff had a number of echocardiograms, the last of which showed him to have an ejection fraction of about 10 percent, Tr. 494, 498; the Medical Expert, without having a chance to review the results of the latest echocardiogram, opined that the evidence suggested that Plaintiff's ejection fraction likely was higher than the requisite 30 percent.  Tr. 43.[7]  As a result, the ALJ determined that the opinion of the Medical Expert was more consistent with the evidence in record than the comments of the treating physician Dr. Chandrasekaran.

An ALJ must choose which sources to credit and is free to reject the opinion of a treating physician when that opinion is contradicted by substantial evidence.  *Plummer*, 186 F.3d at 429. Here, however, the Court cannot make a determination as to whether or not the ALJ fully

---

[7] The Medical Expert determined that, without any evidence to the contrary and in light of Plaintiff's testimony, the ejection fraction did not meet the required minimum for the social security listing and that therefore, in his opinion, Plaintiff did not qualify as disabled due to congestive heart failure.  Tr. 43.

considered the evidence regarding Plaintiff's ejection fraction levels. Despite the results of the April 2009 test, the ALJ noted in his decision that "[t]here is no indication that [Plaintiff's ejection fraction levels] ever returned to that level [under 30%], although it was always below average." Tr. 18. The ejection fraction level measurement was key in determining Plaintiff's disability status. Additionally, because the Medical Expert did not have access to any of Plaintiff medical records after 2007, as provided to the ALJ in exhibit 11F, it is necessary to allow the Medical Expert to render an opinion after consideration of that evidence.[8] As the Medical Expert noted, evidence showing a lower ejection fraction level could have an impact on Plaintiff's disability status.[9] For the foregoing reasons, this case shall be remanded in order to afford the ALJ an opportunity to further consider the evidence or further explain his previous decision in light of the April 2009 ejection fraction level measurements, and take such other steps as the ALJ shall deem proper in order to evaluate plaintiff's ejection fraction measurements and their impact on the various doctors' opinions.

## CONCLUSION & ORDER

For the reasons set forth in this Opinion, and after careful review of the record in its entirety, the Court will **REMAND** the decision of the ALJ and the Commissioner to deny Plaintiff Social Security benefits.

Therefore, **IT IS** on this 20th day of December, 2011

**ORDERED** that this case is **REMANDED** to the ALJ for development of the record and

---

[8] The Medical Expert stated "…without any further evidence after June of '07, his ejection fraction level is probably 30 to 35 percent, not the lower one." Tr. 43.

[9] Dr. Fechner testified that Plaintiff could "do a full range of sedentary [work], and, depending on . . . what the new evidence is that is coming in, if it shows us something different, the RFC could go up or down." Tr. 45. It is this issue that must be resolved upon remand.

explanation of the ALJ's findings, including an analysis of whether Plaintiff's ejection fraction levels have stabilized at a level that meets the required listing or were due to acute attacks.[10]   If the ALJ deems it appropriate under the law, the ALJ may appoint a neutral physician to measure the Plaintiff's current ejection fraction level.

      **IT IS FURTHER ORDERED** that this case is **CLOSED**.

/s/ Faith S. Hochberg
Hon. Faith S. Hochberg, U.S.D.J.

---

[10] The various measurements of Plaintiff's past ejection fraction levels in the record are: 45% (2005); 30% (October 25, 2006); 10% (February 15, 2007); 10% (March 6, 2007); 30-35% (June 12, 2007); and 10% (April 20, 2009).  Tr. 304, 183, 175, 187, 381, 498.  There is no measurement thereafter.